[S. F. No. 22702. In Bank. Feb. 24, 1970.]

WILLIAM ARCHIE FAIN, Petitioner, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Walter C. Hancock, Public Defender, and Robert Y. Bell for Petitioner.

No appearance for Respondent.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Charles P. Just, Deputy Attorneys General, for Real Party in Interest.

## OPINION

MOSK, J.—By this petition for writ of mandate defendant William Archie Fain seeks to compel respondent superior court to grant his motion for change of venue prior to retrial of the penalty phase of his prosecution for murder and other crimes. After an independent review of the record, we have concluded there is a reasonable likelihood defendant cannot obtain a fair trial of this matter in Stanislaus County, and hence a change of venue must be ordered.

A chronology of the events and the attendant publicity follows:

On June 19, 1967, defendant stopped a car containing three high school students, two girls and a boy, outside a town in Stanislaus County. Defendant killed the boy with a shotgun blast, kidnaped the girls in his own car, and sexually assaulted them in a remote field. He was arrested the next morning and charged with murder, kidnaping, rape, and oral copulation. To these were subsequently joined additional counts of rape and attempted kidnaping committed against other women victims during the preceding 10 days. Defendant denied the crimes and interposed a defense of alibi. The jury found him guilty on all counts, and on the murder charge fixed the penalty at death.

The coverage of the crimes and the trial in the local newspapers was substantial. It was reported that defendant was arraigned at a "semi-secret" hearing "due to concern by the Stanislaus County Sheriff's office of possible violence by friends and relatives of the victims." Subsequent accounts related that, "Tension created by the apparently cold blooded slaying of Ulrich, a popular Oakdale High School athlete, and the rape of the two young girls continued to cause the sheriff's department a great deal of concern Friday as Fain was kept under heavy guard during his stay in the Oakdale courtroom."

On September 27, 1967, the verdict of guilty received front-page headlines in the principal Modesto newspaper. The testimony at the penalty phase was reported in detail, and on October 4 the verdict of death received similar front-page treatment. The report stated that defendant took the stand in the penalty phase and "in a surprise move" recanted his earlier denials and confessed to committing the major crimes charged.

For the next 18 months the case was on automatic appeal before this

court. Yet the Modesto newspaper kept the matter in the public eye. On August 18, 1968, for example, an article revealed the contents of defendant's brief on appeal, then quoted at length from the "answers" thereto propounded in the brief of the Attorney General. The article bore the headline, "Guilty Verdict In Fain Case Was 'Justified,' State Rules." We had not, of course, "ruled" on the appeal by that date; indeed, we had not even heard the oral arguments.

On March 13, 1969, this court reversed defendant's judgment of death because of violations of the mandate of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and remanded the case for a new trial on the issue of penalty. (*People* v. *Fain* (1969) 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65].)

The reversal was front-page news in the Modesto press of March 14, 1969. The article stated, "This is the first time a verdict in a Stanislaus County murder case has been reversed." It further reported that the district attorney "believes a virtual retrial on the entire case will be necessary in order to acquaint a new penalty phase jury with the facts." Finally, the article reiterated the evidence introduced at the first penalty trial, and again noted that "in a surprise move" defendant had confessed on the witness stand.

Two kinds of newspaper stories have since maintained the public interest in this case in Stanislaus County. First, every procedural step taken, no matter how trivial, has apparently been deemed worthy of coverage. Thus on April 18, 1969, the Modesto newspaper reported the contents of defendant's pending petition for rehearing, and quoted the district attorney as being of the opinion that the contentions there made were "bootstrap-type arguments" and "I doubt very much that he gets a new hearing." A series of subsequent articles described defendant's return to Stanislaus County jail and the delays in starting his retrial.

Secondly, on the night of July 8, 1969, defendant and five fellow prisoners escaped from the county jail. Two were quickly captured, but headlines in the principal Modesto newspaper on the following morning announced, "Murderer Remains On The Loose." All three local papers gave the event heavy coverage, characterizing defendant as "desperate" and a man "with nothing to lose." On July 10 the Modesto press reported the recapture of defendant, publishing large photographs of him in the custody of officers. The same issue also contained an article describing the fear and alarm felt by local citizens upon learning of defendant's escape: "During his period of freedom, some frightened residents of the county locked doors and

expressed anxious fear the county jail is not equipped or staffed for long-term detention of prisoners requiring maximum security." The view was voiced that a prisoner such as defendant was too dangerous to be housed in the community jail facilities. One newspaper reported that the district attorney praised local residents who assisted in the search operations, calling it "citizen involvement at its best." The article quoted defendant as telling his captors that he "would try to escape again if he had the chance because he had 'nothing to lose.' "

To give a full picture of the publicity in this case, it must be added that (1) most newspaper articles mentioning defendant since his conviction over two years ago reiterated the nature of his crimes and the names and ages of his victims, and (2) virtually every article mentioning defendant since our decision on his appeal also reiterated the reasons we gave for reversal.

On September 11, 1969, defendant filed a motion under Penal Code section 1033 for a change of venue on the ground that a fair and impartial trial of the penalty issue could not be had in Stanislaus County. In support of the motion, the newspaper clippings hereinabove quoted were introduced into evidence. The motion was denied, and defendant promptly sought a writ of mandate from the Court of Appeal. That court refused relief, but upon application we issued an alternative writ.

The case is controlled by *Maine v. Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372]. We there recognized (at p. 382) that "appellate courts must, when their aid is properly invoked, satisfy themselves *de novo* on all the exhibits and affidavits that every defendant obtains a fair and impartial trial." In making that appraisal the courts must now apply the standard we adopted in *Maine* (at p. 383): " 'A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a *reasonable likelihood* that in the absence of such relief, a fair trial cannot be had. . . . A showing of actual prejudice shall not be required.' " (Italics added.)

In the matter before us defendant has amply demonstrated a reasonable likelihood that he can no longer have a fair and impartial trial in Stanislaus County. Although each case must turn on its own facts, it is instructive to compare the present case with *Maine*. Both involved capital charges, arising out of the brutal and senseless murder of a young male escort and the kidnaping of his female companion(s), followed by a sexual attack on the latter. In both cases the victims were popular local teenagers, whose fate drew expressions of public sympathy and aroused hostility towards the defendant(s). In *Maine* the defendants were strangers to the town in question; here defendant was from Stockton in San Joaquin County,

had been a resident of the Modesto area for only a few months prior to the crimes, and had not been integrated into the community. In *Maine* a co-defendant's confession was disclosed prior to trial; here the fact that defendant recanted and confessed at the first penalty trial was reiterated and emphasized in the newspaper reports preceding the retrial. While the population of the county of original venue is larger in this case than in *Maine,* the difference is merely relative and a trial of this nature remains a significant event in the community here involved.[1]

The principal element of the *Maine* case not present here is a political rivalry between the district attorney, the trial judge originally assigned to the case, and one of the defense counsel. (68 Cal.2d at pp. 386-387.) That was a somewhat unusual circumstance, however, and certainly was not intended to constitute a prerequisite for granting a change of venue. On the other hand, the present case includes two elements favorable to defendant which were absent in *Maine.*

First, in that case the trial had not yet occurred, while here the community has already been exposed to massive publicity attendant upon defendant's trial, conviction, appeal, and reversal of penalty, and it would be difficult to find many local residents who have not been influenced by it in some degree. ■ The Attorney General emphasizes that defendant's guilt is no longer in issue, and that the pending penalty trial will be governed by the "expansive" rules of evidence applicable to such proceedings. But the issue of whether defendant lives or dies is manifestly no less critical than the issue of his guilt; and precisely because of the broader rules of admissibility and the absence of standards to guide the jury in choosing the appropriate punishment, a fair and impartial jury is no less essential at the penalty phase than at the guilt phase. Concern for an unbiased penalty jury, indeed, lies at the heart of *Witherspoon*: distinguishing between the functions of the jury in finding guilt and fixing penalty, the Supreme Court reasoned (391 U.S. at p. 518 [20 L.Ed.2d at p. 783]): "It has not been shown that this jury was biased with respect to the peti-

---

[1]The population of Mendocino County, where the crimes in *Maine* took place, is 52,400, ranking 34th of California's 58 counties; the population of Stanislaus County is 184,600, but it ranks only 21st. (*Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357, 373 [66 Cal.Rptr. 710, 438 P.2d 358], Appendix A.) In any event, population size alone is not determinative. We admonished in *Maine* (68 Cal.2d at p. 387, fn. 13) that "We do not intend to suggest, however, that a large city may not also become so hostile to a defendant as to make a fair trial unlikely." Thus in *Smith* v. *Superior Court* (1969) 276 Cal.App.2d 145 [80 Cal.Rptr. 693], a writ of mandate issued to compel a change of venue in a trial of a public official on charges of bribery and perjury filed in the Los Angeles Superior Court; because of the nature and scope of pretrial publicity, the Court of Appeal determined that the defendant could not receive a fair and impartial trial in Los Angeles, the most populous county in the state.

tioner's guilt. But it is self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments."

Secondly, the recent and sensational event of defendant's escape from the Stanislaus County jail—the newspapers reported it to be the first escape from that facility in the 14 years since it was built—catapulted his case onto the front pages again, and provoked a wave of alarm and concern throughout the community. The Attorney General seeks to minimize this development by observing that evidence of the escape will be admissible in the forthcoming penalty trial in any event, as tending to show defendant is a dangerous man with little chance of rehabilitation. Nevertheless, defendant is entitled to have that evidence weighed by an *impartial* trier of fact, rather than by jurors who have been personally subjected to the fear and other emotions aroused by this very escape.

Next, the Attorney General contends that the publicity concerning the escape was the "result" of petitioner's own misconduct, and hence should be excluded from consideration by reason of the doctrine of invited error. That doctrine, however, is of limited application in this context. In *People v. Gomez* (1953) 41 Cal.2d 150, 162 [258 P.2d 825], the trial had begun when the defendant attempted to escape from the courtroom during *voir dire* examination of prospective jurors; citing the doctrine of invited error, we upheld a denial of his motion to discharge the jury panel on the ground of prejudice. A defendant should not be permitted to disrupt courtroom proceedings without justification (cf. *Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 558, 560 [68 Cal.Rptr. 1, 440 P.2d 65]) and then urge that same disruption as grounds for a mistrial. But the case at bar is clearly distinguishable. Here defendant caused no courtroom disturbance, and it would be ingenuous in the extreme to believe that he escaped from jail before trial for the purpose of generating publicity of which he could subsequently complain in support of a future motion for change of venue. A defendant who attempts such an escape is no less entitled to a fair and impartial jury than one who, for example, attacks a guard or a fellow inmate—or, indeed, than a model prisoner. If his misconduct amounts to a crime, he can of course be prosecuted therefor, but he may not suffer the further and impermissible penalty of an unfair trial on the original charge against him.

Finally, the Attorney General points out that defendant has now been brought to trial on charges arising out of the escape, and argues that the successful selection of a jury in that case indicates veniremen impartial to defendant can be found in the county. The contention fails to recognize the distinctions between the two proceedings. To begin with, a conviction

of escape (Pen. Code, § 4532, subd. (b)) carries far less serious consequences, of course, than a conviction of first degree murder. ■ This is not to say that the *Maine* rule is in any way limited to capital cases, but the gravity of the charge may reasonably be taken into consideration in determining the risk of prejudice. ■ More importantly, in a trial for escape the jury are instructed on precise standards of law by which to decide the issue of guilt (see, e.g., CALJIC Nos. 961-962); but in the penalty phase of a capital case, as noted above, the jury are vested with absolute discretion to determine which penalty to impose (*In re Anderson* (1968) 69 Cal.2d 613, 622 [73 Cal.Rptr. 21, 447 P.2d 117], and cases cited). Thus jurors who may have read the press accounts of Fain's conduct and perhaps formed opinions on the murder charge could, under proper instructions, objectively decide whether he was guilty of the crime of escape; but such jurors are not reasonably likely to act with total impartiality when called upon to make the essentially subjective determination in weighing the penalties for first degree murder. The test enunciated in *Maine,* it must be remembered, is not a showing of actual prejudice, but whether there is a *reasonable likelihood* that a fair trial cannot be had in the present forum.

We recently rejected claims of erroneous denial of change of venue in *People* v. *O'Brien* (1969) 71 Cal.2d 394, 399-401 [78 Cal.Rptr. 202, 455 P.2d 138, 456 P.2d 969], and *People* v. *Miller* (1969) 71 Cal.2d 459, 471-474 [78 Cal.Rptr. 449, 455 P.2d 377]. The facts of those cases, however, were strikingly different from this: in *O'Brien,* for example, the lack of sustained publicity demonstrated that "the story had long since ceased to be newsworthy." (71 Cal.2d at p. 401.) Equally important, in *O'Brien* and *Miller* the issue was not presented to us until the appeal, after trial and conviction; here, by contrast, defendant has pursued the timely remedy of mandate. ■ We approved—indeed, urged—the use of this remedy in *Maine,* stressing the obvious point that " 'it is proper, and often preferable, to determine the place of trial prior to the actual trial of the case rather than afterwards.' " (68 Cal.2d at p. 381, quoting from a Minnesota decision.) When the issue is thus raised before trial, we explained that doubts should be resolved in favor of granting the motion. (*Id.* at pp. 387-388.)

■ Applying these principles to the case at bar, it appears on the record before us that a change of venue is necessary to guarantee this defendant an unbiased jury in his pending penalty trial. In these circumstances his additional request for an evidentiary hearing to make such a record is dismissed as moot.

Let a peremptory writ of mandate issue directing the Superior Court of Stanislaus County to grant the motion for change of venue, hold a hearing to determine a place where a fair and impartial trial can be had, and transfer the cause to that place.

Tobriner, Acting C. J., McComb, J., Peters, J., Burke, J., Sullivan, J., and Draper, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.